UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Gartner, Inc.,<br>        *Plaintiff*, | Civil No. 3:08cv405 (JBA) |
| *v.* | |
| St. Paul Fire and Marine Insurance Company,<br>        *Defendant*. | March 11, 2010 |

RULING ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT
[Doc. ## 49, 53] AND ST. PAUL'S MOTION FOR JUDICIAL NOTICE [Doc. # 63]

In December 2003 Expert Choice, Inc. ("ECI") brought suit against Gartner, Inc.

("Gartner"), an information technology and consulting concern.  The substance and thrust

of ECI's lawsuit against Gartner (the "ECI Action") is the subject of this action, in which

Gartner alleges that its commercial general liability insurer, St. Paul Fire and Marine

Insurance Company ("St. Paul"), owed and breached a duty to defend Gartner in the ECI

Action, which settled in July 2007 for $21.5 million.  Specifically, Gartner brings claims of

breach of contract, breach of implied covenant of good faith, violation of the Connecticut

Unfair Trade Practices Act, contribution (to the $21.5 million settlement), unjust

enrichment, and equitable subrogation.  The parties have each moved for partial summary

judgment on the breach of contract claim.  For the reasons that follow, Gartner's motion will

be denied, St. Paul's motion will be granted, and St. Paul's motion for judicial notice will be

denied.

I.       Standards

Under the summary–judgment standard familiar to the Court, summary judgment "should be rendered if . . . there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see also, e.g.*, *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009).

Sitting in diversity, the Court applies the substantive law of the state of Connecticut, *see, e.g.*, *Crawford v. First Colony Life Ins. Co.*, 309 F. App'x 506, 509 (2d Cir. 2009), under which

> "[C]onstruction of a contract of insurance presents a question of law for the court[.]"  "It is the function of the court to construe the provisions of the contract of insurance. . . . The [i]nterpretation of an insurance policy . . . involves a determination of the intent of the parties as expressed by the language of the policy . . . [including] what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . [A] contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy . . . [giving the] words . . . [of the policy] their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the insured  . . . ."

*Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*, 274 Conn. 457, 462–63 (2005) (quoting *Bd. of Educ. of City of Bridgeport v. St. Paul Fire & Marine Ins. Co.*, 261 Conn. 37, 40 (2002), and *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 351–52 (2001)).  The standard governing construction of an insurer's duty to defend is also well established:

> In construing the duty to defend as expressed in an insurance policy, "[t]he obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage. If the latter situation prevails, the policy requires the insurer to

2

> defend, irrespective of the insured's ultimate liability. . . . It necessarily
> follows that the insurer's duty to defend is measured by the allegations of the
> complaint. . . . Hence, if the complaint sets forth a cause of action within the
> coverage of the policy, the insurer must defend."  "If an allegation of the
> complaint falls even *possibly* within the coverage, then the insurance
> company must defend the insured."

*Id.* (quoting *St. Paul Fire & Marine Ins. Co.*, 261 Conn. at 40–41, and *Moore v. Cont'l Cas. Co.*, 252 Conn. 405, 409 (2000)) (alterations in original).

As the Second Circuit has explained it, "[t]he duty to defend does not hinge on the skill or manner in which a complaint is drafted, but rests on the *substantive thrust of the complaint*, and the surrounding facts." *R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242, 246 (2d Cir. 2002) (emphasis added) (citing *QSP*, 256 Conn. at 376, and *Schwartz v. Stevenson*, 37 Conn. App. 581, 585 (1995)); *see also Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 778 (2006) ("In Connecticut," courts must "construe pleadings broadly and realistically, rather than narrowly and technically," and this rule requires that "a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension"); *Clinch v. Generali–U.S. Branch*, 110 Conn. App. 29, 37 (2008) (applying *Deming*'s pleading–interpretation rule to duty-to-defend case).

II.     Insurance Policy

On July 24, 2002, St. Paul issued to Gartner a Technology Commercial General Liability Protection Policy (the "Policy") that was effective June 30, 2002 through June 30, 2003 and covered as "insureds" both "Gartner, Inc." and "Decision Drivers, Inc."  (2002

Policy, Jt. Ex. 1, at 1–2.[1])  St. Paul renewed the policy twice, through June 30, 2005.  (Jt. Ex. 2, at 89–90; Jt. Ex. 3, at 197–98.)  Gartner and St. Paul agree on what provisions of the Policy are relevant to this action.  The Policy charged St. Paul with the "duty to defend any protected person against a claim or suit for injury or damage covered by this agreement," and specified that it would "have such . . . duty even if all of the allegations of the claim or suit are groundless, false, or fraudulent."  (Jt. Ex. 1 at 24.)  It provides the following coverage for "personal injur[ies]":

> Personal injury liability.  We'll pay amounts any protected person is legally required to pay as damages for covered personal injury that:
>
> • results from your business activities, other than advertising, broadcasting, publishing, or telecasting done by or for you; and
>
> • is caused by a personal injury offense committed while this agreement is in effect.
>
> *Personal injury* means injury, other than bodily injury or advertising injury, that's caused by a personal injury offense.
>
> *Personal injury offense* means any of the following offenses: . . .
>
> • Making known to any person or organization written or spoken material that disparages the products, work, or completed work of others.

(*Id.* at 23.)  The Policy provides the following coverage for "advertising injur[ies]":

> *Advertising* means attracting the attention of others for the purpose of seeking customers or increasing sales or business. . . .
>
> Advertising injury liability.  We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:
>
> • results from the advertising of your products, work, or completed work; and

---

[1] In addition to submitting their own exhibits, the parties jointly filed an appendix containing a number of exhibits, bates-numbering the pages with the legend "App. [#]." Citations to page numbers of joint exhibits will refer to the bates page number of the appendix rather than the page number of the particular document cited.

4

- is caused by an advertising injury offense committed while this agreement is in effect.

*Advertising injury* means injury, other than bodily injury or personal injury, that's caused by an advertising injury offense.

*Advertising injury offense* means any of the following offenses: . . .

- Unauthorized use of any advertising material, slogan, or title of others in your advertising.

(*Id.* at 23–24.) The parties agree that the 2002–03 policy's language controls disposition of their dispute.

III.   The ECI Action

In its Amended Complaint, filed on April 19, 2004, ECI alleged that it had developed software that incorporated principles of "the Analytic Hierarchy Process" ("AHP")—a "methodology" developed "in the early 1970s" by "[o]ne of Expert Choice's founders" that helps "deal with the complexities inherent in making decisions where there are multiple criteria and conflicting objectives" by "incorporat[ing] both subjective and objective data into a logical, hierarchical framework that enables decision–makers to compare alternative courses of action that, ultimately, narrow down to a final decision"—and "[i]n the early 1990s" was pursued by Gartner, which "had an extensive, worldwide distribution and sales network." (ECI Am. Compl., Jt. Ex. 5, at ¶¶ 5, 10, 15.)[2] In May 1995 "Gartner created a new

---

[2] St. Paul moves the Court to take judicial notice of the fact that the Analytical Hierarchy Process ("AHP") is a term widely recognized and used in the public domain to refer to a variety of decision–making techniques applied in numerous areas of human activity, and that the phrase "Analytical Hierarchy Process" and the initialism "AHP" were so used well even before execution of the 1995 Agreement between ECI and DDI.  (St. Paul Motion for Judicial Notice [Doc. # 63].)  Gartner counters that because determination of whether St. Paul had a duty to defend Gartner in the ECI Action does not depend on the merits or frivolity of ECI's claims against Gartner, the fact that the phrase and initialism appear to be in the public domain—and therefore that Gartner's usage of them could not be a *meritorious* ground for any ECI claim against it—is irrelevant to disposition of Gartner's

subsidiary, Decision Drivers, Inc.," and through Decision Drivers ("DDI") entered into an exclusive software licensing agreement with ECI (the "1995 Agreement") under which ECI licensed its software to DDI. (*Id.* at ¶¶ 11–12.) The ECI–DDI agreement gave DDI the right to develop its own software in derivation from ECI's software code and to "copy and sell [ECI's software] in object code form only as part of [DDI's own software, derived from ECI's software] sold to End–Users." (*Id.* at ¶ 12.)

In 1998, DDI's growth slowed, allegedly as a result of "Gartner's failure to provide DDI with the human resources and capital that [ECI] had been led to believe Gartner would provide." (*Id.* at ¶ 19.) Thereafter, DDI and ECI reached a new agreement (the "1998 Agreement") in which the parties would calculate ECI's royalties by reference to DDI's "gross revenues derived from any source whatsoever," rather than "sales and license renewals of DDI software models derived from ECI's technology." (*Id.* at ¶¶ 12, 20–30.) The 1998 Agreement required DDI to keep confidential ECI's "Confidential Information," which included both the ECI software "source code" and any tangible thing designated as confidential. (*Id.* at ¶ 31.) According to ECI, to effectuate its plan of appropriating ECI's technology into Gartner's own software without paying ECI any royalties, in 1999 Gartner engineered the ouster of ECI's representative on DDI's board of directors, decided to convert DDI into a wholly–owned subsidiary, determined to produce software as Gartner qua

---

claim against St. Paul. (Gartner Opp'n [Doc. # 68].) Because an insurer cannot disclaim coverage on the basis of information outside the pleadings that "indicate[s] that the claim may be meritless or not covered," *Litchfield*, 274 Conn. at 464 (quoting *QSP*, 256 Conn. at 352), St. Paul asks the Court to take notice of information that is irrelevant as a matter of law: the fact of public–domain usage of the terms "Analytic Hierarchy Process" and "AHP" cannot affect the Court's consideration of whether St. Paul had a duty to defend Gartner in the ECI Action. St. Paul's motion must therefore be denied.

Gartner rather than qua DDI, "sought to appropriate ECI's software, and needed unfettered access to and use of such software," "surrepti[ti]ously develop[ed] AHP software based on [ECI's] intellectual property in order to evade the terms of the 1998 Agreement," and negotiated a modification to the 1998 Agreement to provide ECI a 3 percent royalty on DDI's revenues "directly derived only from" its sales and use in consultations of the software it had derived from ECI's software. (*Id.* at ¶¶ 32–49.) ECI alleged that it "relied to its detriment" on Gartner's representations that Gartner "would not take the position that it was a separate entity from DDI for purposes of application of the" licensing agreements. (*Id.* at ¶¶ 48–49.)

While representing to ECI that it needed to restructure the 1998 Agreement between DDI and ECI to enable DDI to resume growing, Gartner had worked to acquire another software company ("Interpose, Inc., a small software development firm in Maitland, Florida"), the "very purpose" of which "was to obtain necessary software development expertise so that Gartner could create a software program derived from ECI's AHP software," with the "plan[] to replace [ECI] software licensed to DDI with its 'own' software in order to avoid having to make royalty payments." (*Id.* at ¶¶ 52–53.) Thus, in October 2000 "Gartner unveiled its 'Decision Engine' decision–support software tool," which ECI alleged "was directly based on and was merely a modification of the Decision Drivers software that DDI had developed pursuant to its licensing agreement with [ECI], and was therefore [ECI software] subject to the 1998 Agreement" royalty–payment provisions. (*Id.* at ¶¶ 54.) When ECI sought to collect royalties on Gartner revenues derived from sales of Decision Engine, Gartner argued that Decision Engine "'was developed by Gartner independently of the [ECI] software licensed to [DDI], and is not based on, or derived from,

the [ECI] software in any way.'" (*Id.* at ¶¶ 57–58 (quoting e-mail from Gartner).)  Finally,

ECI alleged:

> 69. On information and belief, Gartner has also marketed, sold, and licensed software products that are strictly prohibited by the 1998 Agreement. Article 2.2(a) of the 1998 Agreement states that DDI may not "directly or indirectly produce, market or sell general purpose decision–making software based on [ECI] Software or [ECI's] Intellectual Property Rights."  Article 2.2(b) of the 1998 Agreement states that "[DDI] Software shall not be sold in a form that is competitive with, or a substitute for, [ECI's] Team Expert Choice software product."  On information and belief, Gartner is producing, marking and/or selling "general purpose" decision–making software based on ECI's software, and selling software that competes with ECI Team Expert Choice software.  These activities breached the 1998 Agreement. . . .

> 74. Yet even as Gartner covertly misappropriated and exploited ECI's intellectual property rights as a centerpiece of its strategic expansion, Gartner enticed ECI to participate in . . . a fruitless renegotiation of the terms of the licensing agreement, misrepresented ECI's product and technology as obsolete, and falsely claimed that Gartner's acquisition of all of DDI's stock had changed the "business model."  On information and belief, Gartner decided either at DDI's inception or subsequently, to use DDI as a contracting intermediary in an effort to insulate Gartner from contractual liability to Expert Choice.  Gartner's conduct was fraudulent. Expert Choice relied to its detriment on this fraudulent conduct by, *inter alia*, modifying the royalty provisions of the 1998 Agreement, not taking appropriate legal steps to enjoin Gartner from appropriating its protected intellectual property, remaining in its contractual relationship with DDI, not seeking other contracting partners, and not seeking alternative methodologies for capitalizing upon its intellectual property.  As a result, Gartner was able to launch a competing AHP product to customers who would otherwise have purchased AHP software from DDI or from Expert Choice. . . .

> 81. As a result of Gartner's control and domination of DDI, Expert Choice has been wrongfully deprived of royalty payments and other economic benefits due to it under the 1998 Agreement.  Expert Choice has also suffered injury by virtue of Gartner's marketing and sale of "general purpose decision-making software" based on Expert Choice's intellectual

> property, and software that competes with Expert Choice's Team Expert
> Choice software product.

(ECI Am. Compl. at ¶¶ 69, 74, 81.)  ECI brought twelve causes of action: a request for declaratory judgment, breach of contract, malicious breach of contract, fraud, quantum meruit/unjust enrichment, tortious interference with contract, tortious interference with business expectancies, misappropriation of trade secrets, conversion, civil theft,[3] a violation of the Connecticut Unfair Trade Practices Act,[4] and copyright infringement.[5]

As this recitation of ECI's allegations makes clear, the gravamen of ECI's suit was that at some point in the late 1990s Gartner determined to steal ECI's source code, that while it was doing so Gartner misrepresented its business plans to ECI to forestall ECI from bringing legal action to protect its interests, and that Gartner then developed and sold software derived from ECI's intellectual property that Gartner misrepresented as its own software unrelated to ECI's source code—all towards the end of reaping financial rewards

---

[3] ECI's "conversion" count alleged that "Gartner, without authorization, assumed and exercised control and ownership over monies, royalties, intellectual property, and property of Expert Choice, to the exclusion of Expert Choice, and despite Expert Choice's demands." (ECI Am. Compl. at ¶ 128.)  It alleged essentially the same thing as to civil theft.  (*See id.* at ¶ 132.)

[4] In its CUTPA claim ECI alleged that "[b]y misappropriating confidential information owned by [ECI], by engaging in acts of misrepresentation and fraud, and by secretly developing a competing software product based on Expert Choice's intellectual property, Gartner has committed unfair and deceptive acts or trade practices as defined in Conn. Gen. Stat. § 42-110b."  (ECI Am. Compl. at ¶ 140.)

[5] In its copyright–infringement claim ECI alleged a "valid copyright with respect to the text, methodology, operation, concept, and underlying code of this software, all of which were original and creative," that "[t]he software issued by Gartner was substantially similar to Expert Choice's software," and that Gartner's infringement occurred "[w]hen it unveiled and commenced to market its 'proprietary' Decision Engine in October 2000," which it "ha[d] continued to market . . . up to the present."  (*Id.* at ¶¶ 143–146.)

from ECI's intellectual property without having to pay anything to ECI.  ECI's complaint contains no allegations as to its own efforts to sell products, only incidentally alleging that the name of its own end–user software was "Team Expert Choice" or ""Expert Choice for Windows."  (*See, e.g.*, ECI Am. Compl. at ¶¶ 27 n.1, 69, 81.)  Its allegations of copyright infringement indicate that it laid claim to a copyright in the *operation* (i.e., source code) of its software and that its infringement claim rested on Gartner's incorporation of that source code into the Gartner–branded product Decision Engine; and its CUTPA claim was premised on Gartner's development of software (i.e., Decision Engine) that was based on, and misappropriated, "[ECI's] intellectual property."  (*See id.* at ¶¶ 135–147.)  ECI did not allege that it owned any particular registered or unregistered marks.

IV.     Discussion

   A.     Coverage for Personal Injuries

   The Court "begin[s] by examining the language of the applicable policy."  *Litchfield*, 274 Conn. at 465.  St. Paul's duty to defend extends to any "claim or suit for injury or damage covered by" the Policy.  The Policy covers any "personal injury," defines "personal injury" by the kind of offense that causes the injury, and defines a "personal injury offense" to include Gartner's "[m]aking known to any person or organization written or spoken material that disparages the products, work, or completed work of others."  Gartner argues that when ECI alleged that Gartner "misrepresented ECI's product and technology as obsolete" (ECI Am. Compl. at ¶ 74), it raised the possibility of a claim that Gartner disparaged ECI's products.  Gartner notes that ECI incorporated this allegation into its CUTPA claim (*see id.* at ¶ 135 (incorporating all previous allegations)), and that CUTPA prohibits product disparagement, *see, e.g.*, *World Championship Wrestling v. Titan Sports,*

*Inc.*, 46 F. Supp. 2d 118, 123–24 (D. Conn. 1999), arguing that the allegations of the ECI complaint thus could support a cause of action under CUTPA for disparagement (Gartner's Mem. Supp. at 34). St. Paul argues that the ECI complaint cannot be read to raise a claim of disparagement because ECI's allegation concerned Gartner's communications *to ECI* and not to any third persons. Citing *Springdale Donuts*, St. Paul argues that under Connecticut law, an insurer that issued a policy covering injuries "arising out of . . . *publication* of material that slanders" has no duty to defend an insured where allegations in the underlying complaint were that "lewd and lascivious remarks" were made to the plaintiff in the underlying action because "[t]he term 'publication' . . . generally refers to the communication of words to a third person," not to the *subject* of the remarks. 247 Conn. at 810–11 (emphasis in original). (*See* St. Paul Opp'n at 32–35.)

 *Springdale Donuts* relied on policy language substantively different from the language at issue here, which does not include "the term 'publication.'" Therefore, the court's holding in *Springdale Donuts* regarding that term is not directly applicable here. However, the language of the 2002–03 Policy makes the *Springdale Donuts* reasoning analogous as a matter of contract interpretation. The Policy would cover injuries caused when Gartner "ma[de] known *to any person or organization* . . . material that disparages the products . . . *of others*." Like the *Springdale Donuts* interpretation of "publication," the Policy's definition of "personal injury offense" unambiguously requires the making known of disparaging remarks to someone other than the subject of the remarks. And St. Paul is correct that the ECI Amended Complaint is devoid of any allegation that Gartner communicated anything disparaging—or, indeed, anything at all—about ECI's products to any third person. Indeed, Paragraph 74 of ECI's amended complaint can reasonably be read only to describe Gartner's

tactics and communications in negotiations with ECI.  Like the two other actions by Gartner that ECI alleges in the first sentence of the paragraph—Gartner's "entic[ing] ECI to participate in . . . a fruitless renegotiation" and "falsely claim[ing] that Gartner's acquisition of all of DDI's stock had changed the 'business model'"—Gartner's "misrepresent[ation]" of "ECI's product and technology" was clearly directed at ECI in the context of negotiations, and not towards "any person or organization" "other" than ECI.

Moreover, neither that paragraph alone, nor the paragraph in the context of the entire complaint, can be read to raise—or make a "substantive thrust" *Bigelow*, 287 F.3d at 246, in the direction of—a claim of business disparagement.  As described above, the gravamen of ECI's complaint was Gartner's fraudulent conduct *towards ECI* as part of a plan to steal ECI's intellectual property and incorporate that intellectual property into software that Gartner held out as its own.  ECI alleges damages flowing from Gartner's theft of this intellectual property, but alleges nothing about damages—for example, in the form of reduced market share, or lost contract bids—flowing from Gartner's *disparaging remarks* about ECI's software in the marketplace.  To the contrary, ECI alleged in Paragraph 74 that "[a]s a result" of ECI's agreeing to modifications to the licensing agreement, failing to object to Gartner's development of Decision Engine software, "not seeking other contracting partners, and not seeking alternative methodologies for capitalizing upon its intellectual property"—all of which flowed from Gartner's "fraudulent conduct" toward ECI—"Gartner was able to launch a competing AHP product to customers who would otherwise have purchased AHP software from DDI or from Expert Choice."  Under the unambiguous definition of a "personal injury offense," the Policy's "personal injury liability" section does

not provide coverage for the conduct ECI alleged in its amended complaint in the ECI
Action.

### B.    Coverage for Advertising Injuries

The primary dispute between Gartner and St. Paul over the applicability of the
advertising injury provisions of the Policy centers on whether the ECI Action involved
claims of Gartner using ECI's material, slogans, or titles in its advertising.  More specifically,
the dispute as the parties frame it is over (1) whether the phrases "decision–tools,"
"decision–making methodology," and "Analytic Hierarchy Process," the initialism "AHP,"
or the name "Decision Driver" constitute "advertising material[s], slogan[s], or title[s]" of
ECI; and (2) whether Gartner used them "in [its] advertising."

Gartner's problem is that nothing in the ECI Action, and nothing in the ECI
Amended Complaint, refer in any way to any marketing efforts *of ECI*.  It is unclear whether
the ECI Amended Complaint could reasonably be read as claiming any ownership or right
to the phrases, initialism, or name listed above since the complaint's references to the
concept of AHP describe it as the intellectual underpinning of ECI's software but not its
software's title (indeed, the only ECI software titles the complaint lists are "Team Expert
Choice" and "Expert Choice for Windows,"  phrases that ECI does not allege Gartner used
in any capacity).  More fundamentally, nothing in the ECI Action suggests that ECI used any
of the phrases, initialism, and title listed above—"decision–tools," "decision–making
methodology," and "Analytic Hierarchy Process," the initialism "AHP," or the name
"Decision Driver"—as "any element, idea or part of something that attracts the attention of
others for the purpose of seeking customers or increasing sales or business" (Gartner Mem.
Supp. at 21 (constructing definition of "advertising material")), "'a brief attention–getting

phrase used in advertising or promotion or a phrase used repeatedly, as in promotion'" (*id.* at 22 (describing "slogan")), or a "'distinctive name, appellation or epithet,' including a product name" (*id.* at 24 (constructing definition of "title")).[6]

Although Gartner focuses on ECI's allegations and discovery materials concerning *Gartner's* use of these phrases, the plain language of the Policy affords coverage only if these phrases are the "advertising material, slogan, or title" "of" someone "other" than the insured (Gartner).  (Jt. Ex. 1 at 24.)  In this case, the phrases must be ECI's phrases.  *See also QSP*, 256 Conn. at 355–63 (no coverage if the plaintiff in the underlying action could not, as a matter of law, have suffered injuries for the covered offenses on which basis the insured claims the insured owed a duty to defend).  Moreover, the materials, slogans, or titles at issue must have been used by ECI in its "advertising," that is, ECI's attempts to "attract[] the attention of others for the purpose of seeking customers or increasing sales or business" (Jt. Ex. 1 at 23.)  Thus, even assuming that the phrases, initialism, or name listed by Gartner were ECI's "material, slogan, or title," Gartner still has the burden of showing that the ECI Action involved ECI's use of the phrases, initialism, or name *in its advertising*.  Nothing in the ECI

---

[6] The Court assumes, without deciding, that these definitions of "advertising material," "slogan," and "title" could be appropriately applied in this case.  For its construction of the term "advertising material" Gartner combined the Policy's definition of "advertising" with definitions of "material" found in a 2000 Illinois district court case and the American Heritage Dictionary (4th ed. 2004).  For its definition of "slogan" Gartner quotes *Ultra Coachbuilders, Inc. v. Gen. Sec. Ins. Co.*, No. 1:02cv675(LLS), 2002 WL 31528474, *3 (S.D.N.Y. Jul. 15, 2002), which in turn quoted a "definition of slogan" that had been offered by the Supreme Court of California, which it apparently derived from Webster's Collegiate Dictionary (10th ed. 1993) and American Heritage College Dictionary (3d ed. 1993).  For its definition of "title" Gartner quotes *NorFab Corp. v. Travelers Indem. Co.*, 555 F. Supp. 2d 505, 510 (E.D. Pa. 2008) and cites *Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 200 (3d Cir. 2004).

Amended Complaint or the ECI Action relates to ECI's "advertising," so the "advertising injury liability" section did not trigger St. Paul's duty to defend Gartner in the ECI Action. *See A Touch of Class Imports, Ltd. v. Aetna Cas. & Sur. Co.*, 901 F. Supp. 175, 177 (S.D.N.Y. 1995) (explaining that duty to defend premised on advertising–injury provisions requires that the relevant advertising material, slogan, or title be used in advertising by the plaintiff in the underlying litigation).

Gartner argues that ECI's allegation that "[o]ne of Expert Choice's founders developed the" AHP methodology (ECI Am. Compl. at ¶ 5) "can be read to allege that because its founder had a role in the creation of the AHP methodology, ECI had an interest in that title or slogan" (Gartner Reply Supp. at 5–7). Gartner's argument fails for the same reason stated above: there are no allegations whatsoever regarding ECI's own advertising, and there is nothing in the ECI Amended Complaint or in the litigation undertaken in the ECI Action suggesting that ECI used the phrase "Analytic Hierarchy Process" or the initialism "AHP" in its advertising.

Gartner also argues that ECI asserted an interest "in the name under which [Decision Drivers] was marketed," and that ECI's allegation that Gartner "misrepresented ECI's product . . . as obsolete" (ECI Am. Compl. at ¶ 74) is "'reasonably susceptible'" to a reading that ECI was referring to "Decision Drivers" as "ECI's product" (Gartner Reply Supp. [Doc. # 66] at 4–5). Gartner's characterization of the ECI Amended Complaint does not withstand scrutiny. Even if ECI's assertion that it "was entitled to royalties from Gartner's sale of Decision Drivers" could be read to "alleg[e] that [ECI] retained an interest[] . . . in the Decision Drivers product itself," that assertion has no bearing on whether ECI alleged an interest "in the name under which that product was marketed." Not only is the ECI

15

Amended Complaint not "reasonably susceptible" to Gartner's reading, but that reading is belied by the 1998 Agreement itself, which was the contractual basis for Gartner's (not ECI's) development of "Decision Drivers" in derivation of "ECI's product" (that is, its source code) in the first place, and the "fruitless renegotiation" which is the subject of Paragraph 74.[7]

In any event, Gartner's characterizations are far afield from the "substantive thrust" of the ECI Action, which was focused only on Gartner's use of ECI's intellectual property in developing its own Gartner–branded products.  The licensing agreements at the heart of the ECI Action specifically provided DDI, as "Licensee," a "worldwide right under all of [ECI's] Intellectual Property Rights in and to [ECI's] [s]oftware" to "use, display, copy, and make Improvements to [ECI's] [s]oftware *for the purposes and only for the purposes of developing*," and to "copy and sell [ECI's] [s]oftware in object code form only and only as *part of*" Gartner's own "Licensee Software," that is, Decision Drivers.  (ECI Am. Compl. at ¶ 27 (quoting 1998 Agreement at art. 2.1) (emphases added).)  ECI specified what the 1998 Agreement "delineate[d]" as "the boundaries of [DDI's] license" and how the agreement "define[d] 'Licensee Software.'" (*Id.* at ¶¶ 28–29 (quoting 1998 Agreement at arts. 1.8 and 2.6(d)).)  DDI developed the "Decision Drivers" software as "Licensee Software" under the 1998 Agreement.  (*See id.* at ¶¶ 11–18.)  Nothing could be clearer than that ECI was

---

[7] Further, Gartner's usage was not "unauthorized." The Policy requires that Gartner's use of ECI's "advertising material, slogan, or title" be "*unauthorized.*" ECI alleged that the ECI–DDI licensing agreements contemplated that Gartner qua DDI would "'develop[], market[], license[] or s[ell]'" its own software "'to End-Users.'" (ECI Am. Compl. at ¶¶ 27, 29 (quoting 1998 Agreement at arts. 2.1 and 1.8).)  Thus, the same mechanism on which Gartner bases its assertion that ECI laid claim to the title "Decision Drivers" as DDI's "Licensee Software" also specifically authorizes DDI and Gartner to use that title.  Gartner's usage is therefore not "unauthorized," and thus falls outside the Policy's coverage for advertising–injury liability.

complaining that Gartner denied that its "Decision Engine" product was in substance "Licensee Software," and thus subject to the 1998 Agreement's royalty–payment provisions. By the terms of the 1998 Agreement, "Licensee Software" was DDI's (and Gartner's), not ECI's.  (*Id.*)  No reasonable reading of the ECI Action or the ECI Amended Complaint would find any allegations that ECI laid claim to the advertising material, slogan, or title "Decision Drivers," or that ECI in any capacity ever used such title in its own advertising.[8]

---

[8] Gartner argues that pre-settlement litigation developments in the ECI Action also support its claim that the ECI Action involved a possible advertising injury offense. According to Gartner, ECI's assertion that it was "entitled to damages based upon revenues from a software product titled 'Decision Engine for Cost Management' ('DECM'), which had no connection to the methodologies or software that was at issue in the case," reflected ECI's focus on the title "Decision Engine" as the basis for its claim to damages since that title "was similar to ECI's title 'Decision Drivers.'" According to Gartner, counsel for ECI also focused on the title "Decision Engine" in at least one deposition.  (Gartner Mem. Supp. at 30.) Gartner's characterization of the basis for ECI's assertion is belied by the ECI Amended Complaint itself, which specifically alleged that Decision Engine was the product developed by Gartner and unveiled in 2000 that incorporated ECI technology and intellectual property, on whose sales ECI claimed entitlement to royalties.  Gartner's characterization notwithstanding, ECI very clearly asserted that Decision Engine was closely "connect[ed] to the methodologies or software that was at issue in the case."

Gartner also points to ECI's discovery demands for "'all "marketing materials" referencing Decision Engine, Decision Drivers, AHP, or RHA,'" including "consulting proposals Gartner sent to potential clients" that fell within the request because "'many of the contracts . . . reference[d] . . . AHP,'" and argues that the fact that some of the responsive documents contain the phrases, initialism, and name listed above reflects that "ECI's claims against Gartner . . . were based, in part, on Gartner's unauthorized use of advertising materials, slogan[s] or title[s] of others, including the 'titles' or 'slogans' 'AHP' and 'Decision Drivers,' which belonged to ECI, in Gartner's advertising."  (Gartner Mem. Supp. at 31 (quoting ECI's letter to Magistrate Judge Smith and Gartner consultation proposals; alterations in Gartner Mem. Supp.).)  These arguments assume that the phrases, initialism, and name listed above were the "advertising material[s], slogan[s], or title[s] *of* ECI.  The Court has concluded, however, that they are not.

Indeed, that the ECI Action did not cover or address ECI's *advertising* material, slogan, or title, as such, is clear from the context of the "substantive thrust" of ECI's Amended Complaint, which, as discussed above, was directed at Gartner's alleged unauthorized and unlawful incorporation of ECI's intellectual property, without attribution or payment of royalties, into software branded and sold by Gartner, not Gartner's unauthorized use of advertising material ECI directed at the marketplace of end–users. It would be unreasonable to construe the ECI Action as raising any advertising–injury claims. And even if it did, nothing in the ECI Action suggests that Gartner's putatively misappropriative advertising "'*contribute*[*d*] *materially* to the injury'" ECI alleged that it suffered. *Bigelow*, 287 F.3d at 248 (quoting *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 750 n.8 (3d Cir. 1999)) (emphasis in *Bigelow*).

Comparing the ECI Action to the cases on which Gartner relies is instructive, because in each of these cases, the court found the insurer's duty to defend triggered by allegations in the underlying action about use of particular advertising material, slogan, or title by both the insured *and* the plaintiff in the underlying action. As explained above, in the ECI Action, by contrast, claims regarding advertising by the plaintiff in the underlying action are nonexistent, and thus the advertising–injury provisions of the Policy do not afford coverage. For example, in *Granutec, Inc. v. St. Paul Fire & Marine Ins. Co.*, the Eastern District of North Carolina held that under policies that covered the "misappropriation of advertising ideas" and "unauthorized taking or use of any advertising material," two insurers each had a duty to defend Granutec, a manufacturer of generic drugs, against a lawsuit brought by McNeil, the manufacturer of Tylenol. No. 5:96cv489-BO(2), 2008 WL 312146 (E.D.N.C. Jan. 16, 1998). McNeil alleged that Granutec violated the Lanham Act, engaged

18

in unfair competition and deceptive trade practices, and breached a contract when it "changed the color scheme of its generic product to 'mimic[]' the Tylenol Gelcap," alleging specifically that Granutec "'switched to a red/yellow color scheme to trade upon the goodwill and popularity of [McNeil's] well–known Tylenol Gelcap product and to enhance its own sales at the expense of McNeil.'" *Id.* at *3. The court concluded that "McNeil's allegations supporting its statutory unfair competition claim constitute 'misappropriation of advertising ideas' [and 'unauthorized taking or use of any advertising material'] as objectively understood by Granutec." *Id.* at *3.

In *Ultra Coachbuilders, Inc. v. Gen. Sec. Ins. Co.*, the Southern District of New York held that under a policy covering injuries caused by "infringement of copyright, title or slogan," an insurer had a duty to defend Ultra Coachbuilders ("Ultra") in an underlying suit brought by Ford Motor Company. No. 1:02cv675(LLS), 2002 WL 31528474 (S.D.N.Y. Jul. 15, 2002). Ford alleged that Ultra was liable for "federal and common law trademark infringement" for using the mark "'VQM' in connection with advertising and selling converted Ford vehicles" because that mark was "confusingly similar" to Ford's unregistered mark "'Quality Vehicle Modifier' or the abbreviation, 'QVM,'" with which it certifies certain aftermarket vehicle converters—but not Ultra. *Id.* at *1. The court held that "'QVM' or 'Quality Vehicle Modifier' could potentially qualify as a slogan under either" a Second Circuit or California Supreme Court definition of the term "slogan," and concluded that because Ford had alleged that it "acquired trademark rights in" that abbreviation and phrase, its "complaint potentially states a claim for slogan infringement," thus triggering the insurer's duty to defend. *Id.* at *3. Similarly, the court in *A Touch of Class* found coverage under an advertising–injury provision in the insured's policy covering "injury arising out of

19

. . . infringement of copyright, title or slogan" when the insured suffered a civil judgment against it for trademark infringement by another entity, also called A Touch of Class. 901 F. Supp. at 176. The court found that the insured, which did not own the trademark, "used the trademark in connection with the advertising and sale of its jewelry," and "that the Touch of Class concern that holds the trademark for the phrase at issue used that term as an attention–getting device for its jewelry," that is, as a "slogan." *Id.* at 177. Because the trademark–holding entity used the trademarked phrase as a slogan, and the insured used the same trademarked phrase in its advertising, the conduct for which the insured was held liable was covered by the insurance policy. *Id.*

The remaining cases on which Gartner relies all resemble *Granutec*, *Ultra Coachbuilders*, and *A Touch of Class* in that the relevant underlying lawsuits each clearly involved the use of particular advertising matter—whether materials, slogans, or titles—by both the insured and the plaintiff in the underlying action. *See Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, No. 1:04cv1342, 2004 WL 1730332, *3 (N.D. Ill. Jul. 30, 2004) (underlying allegations addressed similar trade dress and slogans of seasonal decorative lighting products); *NorFab Corp. v. Travelers Indem. Co.*, 555 F. Supp. 2d 505, 507 (E.D. Pa. 2008) (underlying allegations addressed "trademark and trade dress infringement and dilutions," including insured's "manufacture, advertisement, and sale of its own flame and thermal resistant fabric" that were allegedly "'bearing exact imitations of PBI's said distinctive design mark'"); *Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 196–97, 200 (3d Cir. 2004) (underlying allegations claimed perfume manufacturer's licensees' "s[old] a 'watered-down' version of Houbigant's 'Chantilly' fragrance," "us[ed] the Houbigant name to sell non-Houbigant products," and "indicat[ed] that the Chantilly fragrance was produced

by the Insureds"; court concluded that "Houbigant's house mark and product mark (*e.g.*, 'Chantilly') falls within th[e] definition" of "title"); *First State Ins. Co. v. Alpha Delta Phi Fraternity*, No. 1–94–1050, 1995 WL 901452, *3–*4 (Ill. App. Ct. Nov. 3, 1995) (underlying lawsuit involved local fraternities allegedly using trademarked name of international without permission, "'thereby causing confusion and mistake and deceiving others into believing that the former chapter remains associated with the plaintiff Alpha Delta Phi when in fact it does not,'" which triggered insurer's duty to defend under provision covering "'[i]nfringement of copyright, title or slogan'"); *J.A. Brundage Plumbing & Roto-Rooter, Inc. v. Mass. Bay Ins. Co.*, 818 F. Supp. 553, 554–57 (W.D.N.Y. 1993) (in underlying complaint, Roto-Rooter alleged that insured, its franchisee, breached contract by, *inter alia*, "[i]nappropriately and improperly using the Roto-Rooter trademarks in connection with sales and service performed by unauthorized entities"; insurer had duty to defend under policy covering "[m]isappropriation of advertising ideas or style of doing business" and "[i]nfringement of copyright, title or slogan"), *vacated in light of settlement*, 153 F.R.D. 36 (W.D.N.Y. 2004); *P.J. Noyes Co. v. Am. Motorists Ins. Co.*, 855 F. Supp. 492, 494–95 (D.N.H. 1994) (holding that application of prior–publication exclusion could not be determined at summary judgment, but that if exclusion did not apply, policy covering "[i]nfringement of copyright, title or slogan" imposed on insurer duty to defend insured, manufacturer of food pellets, against lawsuit alleging that insured misrepresented product and infringed plaintiff's trademark by describing its product as "Dustfree Precision Pellets," allegedly in violation of plaintiff's trademark of "the designation 'dustfree'").

These cases all accord with the unambiguous text of the 2002–03 St. Paul Policy, which covered Gartner's "use of any advertising material, slogan, or title *of others*," as well

21

as the basic concept of an advertising injury offense, which by its nature involves both advertising by the insured, and the "advertising material, slogan, or title" of another—that is, the plaintiff in the underlying action—that was allegedly used by the insured without authorization.  The ECI Action does not involve the latter—that is, ECI's own "advertising material, slogan, or title"—and therefore the "advertising injury liability" provisions of the 2002–03 Policy did not impose on St. Paul a duty to defend Gartner in the ECI Action.  In other words, whether or not *Gartner* used the phrases, initialism, or name in advertising, the ECI Action did not involve the predicate conduct—*ECI's* use of them in advertising—to turn Gartner's advertising into an advertising–injury offense.

Therefore, under the unambiguous definition of an "advertising injury offense," the Policy's "[a]dvertising injury liability" section does not provide coverage for the conduct ECI alleged in its amended complaint in the ECI Action.

C.      Gartner's Other Claims

At oral argument the parties agreed that if the Court were to grant St. Paul's motion for summary judgment on the claim for breach of contract, that would end the case, and Gartner's remaining claims would be moot.  The Court having concluded that St. Paul is entitled to summary judgment on the breach of contract claim, Gartner's remaining claims are moot, and this case will be closed.

V.  Conclusion

For the reasons stated above, St. Paul's Motion for Partial Summary Judgment [Doc. # 53] is GRANTED, and Gartner's Motion for Partial Summary Judgment [Doc. # 49] and St. Paul's Motion for Judicial Notice of Facts [Doc. # 63] are DENIED.

The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 11th day of March, 2010.